UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/07/2013
```

------------------------------------------------------------X
                                           :

J.M. and N.M. individually, and on behalf of   :
L.M., a minor,
                                          :

                           Plaintiffs,    :       12 Civ. 8504 (KPF)
                                       :

               v.                :       OPINION AND ORDER
                                      :

THE NEW YORK CITY DEPARTMENT OF     :
EDUCATION,
                                       :

                           Defendant.   :
------------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      Plaintiffs J.M. and N.M., individually and on behalf of their special needs child, L.M. (collectively, "Plaintiffs"), filed suit under the Individuals with Disabilities Education Improvement Act ("IDEA," formerly known as the Individuals with Disabilities Act), 20 U.S.C. § 1401-1482, against Defendant New York City Department of Education ("Defendant" or the "DOE").[1]  Plaintiffs bring this action (i) to recover costs they incurred in sending L.M. to a private school for the 2011-12 school year, and (ii) to seek review of an October 24, 2012 decision of the State Review Officer ("SRO") that effectively denied Plaintiffs the ability to recover those costs from the DOE.

---

[1]    The Court does not expressly name the child or the parents because "in an action commenced by a parent or guardian on behalf of a minor child pursuant to the IDEA, the plaintiffs should be permitted to proceed, as a matter of course, using initials in place of full names in public filings with the Court."  *P.M.* v. *Evans-Brant Cent. Sch. Dist.*, No. 08-CV-168A, 2008 WL 4379490, at *3 (W.D.N.Y. Sept. 22, 2008); *see also* Fed. R. Civ. P. 5.2(a); 20 U.S.C. § 1417(c).

The parties have cross-moved for summary judgment.  For the reasons set forth below, Defendant's motion is granted with respect to the specific issues resolved by the SRO, and Plaintiffs' motion is denied to the same extent. The Court remands to the Impartial Hearing Officer ("IHO") those claims raised by Plaintiffs in their administrative complaint that the IHO failed to consider, and, consequently, that the SRO did not address.

## FACTUAL BACKGROUND[2]

As happens frequently in IDEA cases, this case is resolved short of trial, as a result of competing summary judgment motions.  Because the law requires district courts to conduct a searching review of the administrative record in such cases; because the level of deference that this Court must accord the decisions of the administrative officials below varies with the degree to which those decisions were faithful to the record; and because the Court is

---

[2]    The facts are drawn from the parties' submissions in connection with their respective summary judgment motions, as well as facts elicited during the oral argument held before the Court on August 23, 2013 (the "Oral Argument").  These materials include Plaintiffs' Local Rule 56.1 Statement of Material Facts Not in Dispute ("Pl. 56.1") (Dkt. #13); Defendant's Local Rule 56.1 Statement of Material Facts ("Def. 56.1") (Dkt. #16); the administrative record from the proceedings below and attached exhibits, including the transcript from the hearing before the IHO ("Hr'g Tr."), the Decision of the IHO ("IHO Op."), and the Decision of the SRO ("SRO Op."); and the transcript from the August 23 Oral Argument ("Oral Argument Tr.").  Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party.") & (d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

concerned with "getting it right," in this and all cases, the Factual Background section in this Opinion is especially detailed.

## A.      The Legal Framework

The IDEA "requires states to provide disabled children with a free and appropriate public education" ("FAPE"). *Florence Cnty. Sch. Dist. Four* v. *Carter*, 510 U.S. 7, 9 (1993); *see also R.E.* v. *New York City Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012). In accordance with this mandate, school districts are required to create an individualized education program ("IEP") for each qualifying child in order to ensure that the child receives a FAPE.

"The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *T.Y.* v. *New York City Dep't. of Educ.*, 584 F.3d 412, 415 (2d Cir. 2009) (quoting *Lillbask ex rel. Mauclaire* v. *Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir. 2005)); *see also* 20 U.S.C. § 1414(d)(1)(A). At the cornerstone of the IDEA is the requirement that the IEP be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.* v. *Rowley*, 458 U.S. 176, 207 (1982); *see also Gagliardo* v. *Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (citing *Walczak* v. *Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).

In New York State, each school district has a Committee on Special Education ("CSE") that is responsible for developing IEPs for qualifying students within that district.  *Gagliardo*, 489 F.3d at 107.  A CSE is "comprised of members appointed by the local school district's board of education, and must include, among others, the student's parent(s), a regular or special education teacher, a school board representative, [and] a parent representative."  *R.E.*, 694 F.3d at 175; N.Y. Educ. Law § 4402(1)(b)(1)(a) (McKinney 2013).[3]  The CSE is responsible for examining the student's level of achievement and specific needs in order to determine an appropriate educational program.  *R.E.*, 694 F.3d at 175.

If a parent believes that his or her child's IEP fails to comply with the IDEA, the parent may seek relief by filing a due process complaint with the appropriate state agency.  20 U.S.C. § 1415(b)(6).  Upon the filing of a due process complaint, federal law mandates that the parent be provided with an impartial due process hearing before an IHO.  *Id.* § 1415(f).  New York law, in turn, requires a parent to pursue his or her claim first before an IHO; once the IHO renders a decision, either party may appeal the decision to the SRO.  N.Y. Educ. Law § 4404(1), (2).  After the SRO completes his or her review of the IHO's decision, either party may file an action in state or federal court seeking review of the SRO's decision.  20 U.S.C. § 1415(i)(2)(A).

---

[3]     A "parent representative," also referred to as a "parent member," is a parent of another disabled student.  This parent attends the CSE meeting to provide information and support to the parent of the student for whom the CSE meeting is being held.  (Def. 56.1 ¶ 6 n.2).  *See* N.Y. Educ. Law § 4402(a)(viii).

**B.   L.M.'s Disability Classification and Placement Before the 2011-12  School Year**

Plaintiffs J.M. and N.M. (collectively, the "Parents") are the parents and natural guardians of Plaintiff child L.M. ("L.M." or the "student"), a 16-year-old student that Defendant classified as a child with a disability entitled to a FAPE.  (Pl. 56.1 ¶ 1).  For the 2003 through 2007 school years, and for part of the 2008 school year, L.M. attended public school in Staten Island in a 12:1:1 special education classroom (i.e., twelve students, one teacher, one paraprofessional).  (Pl. 56.1 ¶ 2; Oral Argument Tr. 4:9-13).

For each of those school years, the CSE developed an IEP with specific reference to L.M.'s needs and reasonable learning goals, as well as the special education and related services that would be provided by L.M.'s school district.  L.M.'s IEP for the 2008-09 school year, for example, was generated on May 30, 2008; it classified L.M. as having a speech or language impairment, and recommended that she be placed in a 12:1:1 special education classroom in a community school with related services.  (2008 IEP at 1).

In October 2008, when L.M. was nearly 12 years old, the Parents had her evaluated by a therapist because they believed that she was not demonstrating academic and social progress.  (Pl. 56.1 ¶ 3; Oral Argument Tr. 4:13-21).  At that time, L.M. was diagnosed with pervasive developmental disorder, not otherwise specified ("PDD-NOS"), commonly known as autism.  (Pl. 56.1 ¶ 3; Defendants' Impartial Hearing Exhibit ("Def. Exh.") 5 at 5; Oral Argument Tr. 4:16-17).  A few months later, in March 2009, the Parents enrolled L.M. at the Rebecca School, a private school in Manhattan for children ages 4 to 21

with neuro-developmental delays, including children diagnosed on the autistic spectrum.  (Pl. 56.1 ¶ 4; Oral Argument Tr. 4:17-21; Hr'g Tr. 224:8-14).[4]  L.M. attended the Rebecca School for the remainder of the 2008-09 school year, and for the 2009-10, 2010-11, and 2011-12 school years.

L.M.'s IEP for the 2009-10 school year was generated on June 1, 2009; it re-classified L.M. as having autism, and included a revised recommendation that L.M. be placed in a 6:1:1 special education classroom in a 12-month program at a specialized school.  (2009 IEP at 1).  L.M.'s IEP for the 2010-11 school year was generated on February 23, 2010; it also classified L.M. as autistic and made the same recommendation as the 2009-10 IEP.  (2010 IEP at 1).  Neither IEP, however, identified a placement school.

During the 2008-09, 2009-10, and 2010-11 school years, when L.M. attended the Rebecca School, the Parents sought reimbursement of tuition and costs from the DOE by filing an administrative action.  (Oral Argument Tr. 7:11-22).  For each of those years, the Parents resolved their dispute with the DOE by settlement, pursuant to which the Parents were reimbursed, in whole or in part, for the costs of enrolling L.M. at the Rebecca School.  (*Id.*).

## C.    The 2011-12 IEP

### 1.    The January 2011 CSE Meeting

On January 24, 2011, the CSE convened to create an IEP for L.M. for the upcoming 2011-12 school year (the "2011-12 IEP").  (Pl. 56.1 ¶ 5).  The CSE consisted of DOE representative Feng Ye, DOE school psychologist Dr. Rose

---

[4]    The record does not indicate whether L.M.'s IEP was revised at that time to account for the new diagnosis or the change in academic placement.

Foschetta, a parent member, L.M.'s Rebecca School classroom teacher, L.M.'s Rebecca School social worker, the Parents, and the Parents' special education advocate.  (Def. 56.1 ¶ 6).  L.M. did not attend the CSE meeting, although she could have done so.  (*Id.*).

During this annual review, the CSE reviewed and relied on various materials concerning L.M., including: (i) the report of an October 2008 neuropsychological evaluation; (ii) the report of a November 2010 classroom observation; (iii) a December 2010 Progress Report prepared by the Rebecca School (the "December 2010 Report"); and (iv) oral input from the Parents, the Rebecca School classroom teacher, and the Rebecca School social worker. (Def. 56.1 ¶ 7).

Feng Ye had worked on L.M.'s IEP for the preceding three years, and had conducted the November 2010 classroom observation in order to assess how L.M. functioned in the Rebecca School program.  (Hr'g Tr. 14:14-16:5).  The observation lasted approximately 30 minutes, during which time L.M. was meeting with her counselor.  (*Id.* at 16:12-17:16).  Ye related to the CSE that she had conducted observations at the Rebecca School "pretty often," and had completed "at least two or three observations" in L.M.'s classroom.  (*Id.* at 17:21-18:6).  With this knowledge, Ye assessed L.M.'s history and, after considering the 2008 neuropsychological evaluation, the December 2010 Report, and discussions with L.M.'s teachers, assisted in developing the 2011-12 IEP.  (*Id.* at 21:22-28:10).

Dr. Rose Foschetta had also worked on L.M's IEP for the past "few years" with Ye.  (Hr'g Tr. 18:24-19:15).  To prepare for the January 2011 CSE meeting, Foschetta had jointly reviewed, with Ye, the 2008 neuropsychological evaluation, the November 2010 classroom observation, and the December 2010 Report.  (*Id.* at 21:22-22:12).

During the CSE meeting, Andrea Albert, L.M.'s counselor, assisted the group in developing the "daily living skill goals and other goals" component of the IEP.  (Hr'g Tr. 25:10-26:8).  Kaitlin Vigniollo, L.M's then-current classroom teacher, provided the CSE team with "all the information and [] contributed in develop[ing] all the academic and social emotional goals."  (*Id.* at 26:12-20).  L.M.'s parents also participated in the meeting, with L.M.'s father explaining the parents' goals for L.M., which included wanting L.M. to be able to read and write, as well as to be independent and a part of the community.  (*Id.* at 25:1-9; 407:4-16).

### 2.    The CSE's Assessment and Recommendations

The CSE focused on three areas at the January 2011 meeting: L.M.'s (i) academic performance; (ii) social emotional performance; and (iii) health and physical development.  (Def. 56.1 ¶ 8).  During the meeting, the CSE analyzed these topics, and crafted annual goals and short-term objectives accordingly.

### a.    Academic Skills

L.M.'s academic skills, which were assessed principally based on teacher observations, were found to be "low."  (Def. 56.1 ¶ 9).  In particular, L.M.'s

listening, reading comprehension, and mathematical abilities ranged from the mid-first-grade to the mid-third-grade levels.  (*Id*.).  L.M. did, however, respond well when her social needs were met, she was provided with choices, and she was placed in a quiet setting with tactile activities and sensory input.  (*Id*.).  As such, the CSE found that L.M. needed sensory input, sensory breaks, choices, use of manipulative assistance for mathematics, creative and motivating activities, and repetition.  (*Id*.).

The academic goals on the IEP were developed with reference to the December 2010 Report, in addition to input from teacher Vigniollo and the Parents.  (Hr'g Tr. 38:19-39:4).  The academic performance and academic management portions of the IEP were then read to the CSE members; no one expressed any disagreement.  (*Id.* at 31:6-13).

### b.   Social Emotional Performance

Foschetta developed the social emotional performance portion of the IEP, which she based on L.M.'s then-current school reports, as well as input from CSE members, including Vigniollo.  (Hr'g Tr. 31:14-32:23).  Foschetta read aloud the salient components of this portion of the IEP at the January 2011 meeting, and solicited additions or deletions that were then incorporated in the IEP.  (*Id.* at 32:11-23).

Foschetta also developed L.M.'s Behavior Intervention Plan ("BIP") and counseling goals, with the assistance of counselor Albert.  (Hr'g Tr. 32:11-17, 33:19-22; Def. Exh. 3 at 17, 7 at 2).  The CSE concluded that L.M. did not like to be challenged and that her behavior was seriously interfering with

instruction and required additional support.  (Def. 56.1 ¶ 10).  As a result, the CSE recommended counseling services, breaks during the school day, breaks from the classroom with an adult, a BIP, and a one-to-one paraprofessional. (*Id.*).

### c.    Health and Physical Development

The CSE as a group developed the IEP's Health and Physical Development section by reviewing the IEP for the prior school year and by considering information provided by the Parents.  (Hr'g Tr. 37:15-38:11).  The CSE concluded that, although L.M. was in good health, she needed occupational therapy to address her low arousal state, sensitivity to noise, and other sensory issues.  (Pl. 56.1 ¶ 11).

In addition, the CSE members created goals for activities of daily living ("ADLs") and related services goals.  (Hr'g Tr. 39:8-15).  These goals were provided by Rebecca School personnel, and were reviewed with the Parents. (*Id.*).  Because L.M. was 14 at the time the IEP was generated, the CSE included in the IEP a long-term adult transition plan that addressed L.M.'s community integration, post-secondary placement, independent living, and employment.  (Plaintiff's Impartial Hearing Exhibit ("Pl. Exh.") B at 16).  This transition plan was based on information from the Parents concerning their expectations for L.M.  (Hr'g Tr. 45:2-17; Def. Exh. 3 at 16).

### d.    The 2011-12 IEP

Considering this information in its totality — and with particular focus on L.M.'s "cognitive functioning, academic functioning and … needs" (Hr'g Tr.

46:4-47:1) — the CSE created the IEP.  Similar to those for the preceding two school years, the IEP for the 2011-12 school year recommended that L.M. be placed (i) in a 6:1:1 special education classroom (ii) in a 12-month program (iii) at a specialized school with related services, (iv) where L.M. would have a 1:1 paraprofessional.  (Pl. Exh. B at 1, 13).  A 10-month program was rejected because of concerns that it would lead to regression.  (*See* Pl. Exh. B at 11).

With respect to class size, the CSE team discussed various student-to-teacher ratios, and took into account the Rebecca School's input that a 2:1 ratio had worked well for L.M.  (Hr'g Tr. 46:22-47:1).  As for related services, the CSE recommended that L.M. receive, each week, three 40-minute sessions of speech-language therapy (of which two sessions were in a group of two, and one was individual); three 40-minute sessions of counseling (of which two sessions were in a group of three, and one was individual); and one 40-minute session of individual occupational therapy.  (Pl. Exh. B at 12).

The CSE did not recommend a specific school for L.M. because the IEP was being prepared in January for the upcoming 2011-12 school year.  (Def. Exh. 11).  Instead, the DOE informed the Parents that placement would be deferred until June 15, 2011.  (Def. Exh. 11).

Once the IEP was completed, all parties in attendance agreed that the plan as drafted was appropriate for the 2011-12 school year.  (Def. Exh. 7 at 1 (noting that there was "no disagreement stated by anyone at [the] meeting" as to the CSE recommendations)).  Each CSE member, including the Parents, had the ability to express any dissatisfaction with the IEP at the CSE meeting,

or anytime thereafter.  (*See* Def. Exh. 7; Oral Argument Tr. 21:8-18).  Indeed, the CSE could reconvene at any time, at the request of any CSE member, to consider supplemental information that might alter the appropriateness of the IEP.  (Oral Argument Tr. 21:8-18, 34:17-24; *see also* N.Y. Comp. Codes R. & Regs. tit. 8 § 200.4(e)(4)).  The record reflects that no member of the CSE team voiced any dissatisfaction with the 2011-12 IEP at the time it was generated, and that no attempt was made to reconvene the CSE at any time thereafter to amend that IEP.  (Def. Exh. 7; *see* Oral Argument Tr. 21:8-22:2).

**D.    L.M's Placement for the 2011-12 Academic Year**

**1.    L.M.'s Enrollment at the Rebecca School and the DOE's Placement of L.M. at the Hungerford School**

On April 6, 2011, the Parents entered into a contract with the Rebecca School to enroll L.M. for the 2011-12 school year.  (Def. 56.1 ¶ 30; *see* Oral Argument Tr. 25:12-21).  At that time, the Parents submitted an initial $10,000 deposit to the Rebecca School, $2,500 of which was non-refundable.  (Def. 56.1 ¶ 30; Hr'g Tr. 413:3-8).  As Plaintiffs' counsel acknowledged during oral argument, the Parents had every expectation that the DOE would reimburse them for L.M.'s tuition at the Rebecca School, as it had for the preceding 2.5 years.  (Oral Argument Tr. 25:12-15).

On June 6, 2011, the DOE informed the Parents that the Hungerford School, located in Staten Island, had been identified as an appropriate placement for L.M. by sending the Parents a Final Notice of Recommendation ("FNR"), and offering L.M. a placement at that school.  (*See* Def. Exh. 13; Def. 56.1 ¶ 20).  The Hungerford School consisted of 60 students, ages 13 to 16.

(Def. 56.1 ¶ 21).  It had capacity to enroll L.M. in a 6:1:1 classroom starting in the summer of 2011, and indicated that it could provide L.M. with all the counseling, speech, and occupational therapy services mandated by L.M.'s 2011-12 IEP.  (Def. 56.1 ¶ 26; Hr'g Tr. 108:7-110:7).  The Hungerford School also indicated that it could provide L.M. with transitional services.  (Hr'g Tr. 110:9-112:18).

Three days after receiving the FNR, on June 10, 2011, the Parents made an additional payment of $17,240 to the Rebecca School.  (Def. 56.1 ¶ 31).  In total, the Parents paid $86,855 to the Rebecca School for the 2011-12 school year.  (Pl. Exhs. E, F).[5]

On June 27, 2011, Plaintiff J.M. and the Parents' special education advocate visited the Hungerford School.  (Hr'g Tr. 102:21-24, 408:16-18).  During the visit, Linsey Miller, Assistant Principal at the Hungerford School, gave J.M. and the advocate an approximately 30-minute tour of the school and the facilities that would be available to L.M.  (*Id.* at 92:7-24, 103:4-104:8).  Miller also confirmed that there was space available for L.M. at the Hungerford School starting in July 2011.  (*Id.* at 105:2-10).

### 2.    J.M.'s Rejection of the Hungerford School

The next day, J.M. notified the DOE by letter that, based on his visit to the Hungerford School, the Parents could not accept the placement for L.M.

---

[5]    The parents subsequently entered into a second contract with the Rebecca School for L.M. to shorten the program by one month in order to accommodate a family vacation. (Def. 56.1 ¶ 32).

(Def. 56.1 ¶ 34; Pl. Exh. C).  J.M. proffered a litany of reasons as to why he

would not accept the placement:

> (1) The school building is very large and there are over 1,500
> students.  My daughter would easily be overwhelmed.  (2) The
> special education students eat lunch with the general education
> students.  There are approximately 100 students in the cafeteria
> during lunch.  The noise level and commotion would make my
> daughter anxious.  (3) The school's population is composed of
> mainly boys.  My daughter would not have an appropriate peer
> group.  (4) I am concerned for my daughter's safety as security
> seems to be very lax at this site.  She can be very impulsive and
> has the potential to run off.  (5) I observed that many of the
> children at this school are medically fragile and involved.  My
> daughter does not have these types of medical.  Her issues are
> social and emotional/behavioral in nature.  (6) There is no crisis
> intervention team which is of great concern to me since she has a
> tendency to be emotionally volatile and can display acting out
> behaviors.  (7) Additionally, it was explained to me that the school
> does not have a set plan or protocol when dealing with a child who
> is acting out.  I was told that they take the child for a walk till they
> calm down.  This is not acceptable and has me deeply concerned.
> (8) In terms of social skill building, it was explained that the school
> doesn't have a program in place.  It is crucial importance that my
> daughter learns the skills necessary to appropriately communicate
> with people.  (9) Furthermore, I was told that they do not have a
> placement for my daughter until September 2011.  My daughter
> was recommended for a 12 month school year.

(Pl. Exh. C).  J.M. concluded by informing the DOE that, because the CSE had

"failed to recommend an appropriate program/placement in a timely manner

for the 2011-12 school year, [he had] been left with no alternative but to

unilaterally place [his] daughter at the Rebecca School."  (*Id.*).  J.M. also

advised that he planned to seek tuition reimbursement for placing L.M. at the

Rebecca School.  (*Id.*).  Significantly, for purposes of the present motions,

J.M.'s letter expressed no concern with the 2011-12 IEP, but only with the

placement proposed by the DOE.

### 3.   L.M.'s Attendance at the Rebecca School

L.M. attended the Rebecca School for the 2011-12 school year.  (Pl. 56.1 ¶ 37).  During this time, the school issued two progress reports for L.M.  One report issued in May of 2011 (the "May 2011 Report"), and identified changes and updates to L.M.'s education plan at the Rebecca School.  (Def. 56.1 ¶ 19; Pl. Exh. G).[6]  A second, similar report for L.M. issued in December of 2011 (the "December 2011 Report").  (Pl. Exh. H).

## E.   The Parents' Due Process Complaint

On July 11, 2011, the Parents filed a due process complaint (the "Due Process Complaint") alleging that the DOE had failed to offer L.M. a FAPE for the 2011-12 school year, and seeking reimbursement for the tuition and costs occasioned by the Parents' placement of L.M. at the Rebecca School.  (Pl. Exh. A at 1; Def. 56.1 ¶ 35).  This time, the Parents' complaints extended beyond the school placement to the IEP itself.  In relevant part, the Parents challenged the January 2011 CSE meeting, which they claimed was "inappropriate" because, among other reasons:

> the annual review was held [] in January to make recommendations for the [2011-12 year], the CSE was unable to consider [L.M.'s] needs as reflected by []her progress or lack thereof in the second half of the school year…[t]he goals and objectives on the IEP [did] not reflect all of [L.M.'s] educational, social[,] and emotional needs…[t]he IEP was not reasonably calculated to confer educational benefit upon [L.M., and] [t]he IEP goals did not contain evaluative criteria, procedures, or schedules to measure progress.

---

[6]   The record contains no evidence that the May 2011 Report was provided to the DOE before the 2011-12 IEP was implemented in July 2011.  (Def. 56.1 ¶ 19).

(Pl. Exh. A at 2; *see* Oral Argument Tr. 22:22-24:5 (Plaintiffs' acknowledgment that the Due Process Complaint was the first time the Parents took issue with the 2011-12 IEP)).

In the Due Process Complaint, the Parents requested the IHO find that: (i) the CSE failed to offer L.M. a FAPE on both procedural and substantive bases; (ii) both the CSE review and the IEP were substantively flawed; (iii) the Parents had been deprived of the opportunity to participate meaningfully in the development of the IEP for the 2011-12 school year; (iv) the CSE had failed to offer an appropriate program for the 2011-12 school year; (v) the CSE had failed to offer an appropriate placement for L.M.; (vi) the Rebecca School was an appropriate placement for L.M.; (vii) the Parents had cooperated with the CSE; and (vii) the Parents were entitled to reimbursement of tuition, costs, and fees. (Pl. Exh. A at 5).  The DOE responded on April 4, 2012, asserting that the offered placement at the Hungerford School was "reasonably calculated to enable the child to obtain meaningful educational benefits."  (Def. Exh. 2 at 3).

## F.    The Impartial Hearing

### 1.    The Hearings

The IHO held evidentiary hearings on November 16, 2011, December 1, 2012, and January 23, 2012.  (Pl. 56.1 ¶ 40).  During the hearings, the parties offered documentary and testimonial proof to establish and defend their cases. The witnesses who testified on behalf of the Parents included Tina McCourt, the Program Director at the Rebecca School; Joshua Rich, one of L.M.'s Rebecca School teachers; Edith Langford, a psychotherapist at Community

Counseling Mediation who began treating L.M. in May 2008; Ashley Lyons, L.M.'s speech-language pathologist at the Rebecca School; Bridget Henn, L.M.'s occupational therapist; and J.M.  Feng Ye, Linsey Miller, and Kristen Techky, a special education teacher at the Hungerford School, testified for the DOE.

### 2.    The IHO's Opinion

On March 6, 2011, the IHO issued a decision finding that Plaintiffs were entitled to reimbursement, and ordered Defendant to fund L.M.'s tuition at the Rebecca School for the 2011-12 school year.  (Def. 56.1 ¶ 41).

The IHO spent a considerable portion of her opinion recounting the testimony of each of the parties' witnesses, but then, curiously, misperceived or overlooked portions of that same testimony in her analysis.  For example, the IHO detailed Feng Ye's testimony concerning the January 2011 CSE meeting and the generation of the 2011-12 IEP.  (IHO Op. 3-10).  In summarizing this testimony, the IHO acknowledged, citing Ye's testimony, that the "academic goals on the IEP were developed with reference to the [2010 December Report] and input from Ms. Migniollo and the parents"; the related service goals "were provided by Rebecca and were reviewed with the parents at the meeting"; and the "counseling goals were developed by Ms. Foschetta and Ms. Albert, the child's counselor at Rebecca." (*Id.* at 7).  Just a few pages later, however, the IHO stated that "[t]he IEP was developed in January 2011 and was based on the [December 2010 Report]," without mentioning the many other sources of information previously discussed.  (*Id.* at 9).  Similarly, the IHO observed that Ye had informed the Parents that they could reconvene the CSE meeting if they

thought the IEP needed to be changed, and took note of Ye's testimony that the IEP team is a "ten-month team" that did not work over the summer.  (*Id.*).  Later on in her decision, however, the IHO criticized Ye for making these statements, though they were factually and legally accurate.  (*Id.* at 34-35).

After detailing the testimony, the IHO properly identified the governing law, and set forth the test applicable in reimbursement cases:

> [a] Board of Education may be required to pay for educational services obtained for a child by the child's parents, if: 1) the services offered by the Board of Education were inadequate or inappropriate; 2) the services selected by the parents were appropriate; and 3) equitable considerations support the parents' claim.

(IHO Op. 32 (quoting *Sch. Comm. of the Town of Burlington* v. *Dep't of Educ. Mass.*, 417 U.S. 359 (1985))).[7]  The IHO then found that the 2011-12 IEP was not reasonably calculated to provide L.M with educational benefits, and thus, the DOE had not met its burden of demonstrating that it had provided L.M. with a FAPE for the 2011-12 school year (i.e., that the first *Burlington-Carter* element was satisfied).  (*Id.* at 35).

The IHO found that because the IEP was generated in January 2011, nearly six months before its contemplated implementation in July 2011, and because it was based on the December 2010 Report that listed six-month goals, it was "defective in that it did not reflect the child's present levels of academic achievement and functional performance or the academic, developmental and functional needs of the student for the 2011-2012 school

---

[7]     "This framework is known as the *Burlington-Carter* test."  *R.E.*, 694 F.3d at 185; *see generally Walczak*, 142 F.3d at 129 (collecting cases).

year." (IHO Op. 33). The IHO noted, among other things, that L.M.'s levels and goals could have changed during the five additional months of schooling she would receive before the IEP was implemented. (*Id.* at 33-34). The IHO also found that the May 2011 and December 2011 Reports from the Rebecca School confirmed that the 2011-12 IEP was defective, but offered no analysis in support of this conclusion. (*Id.* at 34).

The IHO admonished Ye for advising the Parents that they could reconvene the CSE if they thought that the IEP needed revision, stating that the burden was on the DOE to create an appropriate IEP, and not on the Parents to seek revision. (IHO Op. 34). Along similar lines, the IHO found Ye's testimony regarding the CSE's 10-month schedule to be irrelevant because it had no bearing on the DOE's responsibility to generate an adequate IEP. (*Id.* at 34-35). Hypothesizing, the IHO stated that even if the CSE had convened in May prior to the May 2011 Report being issued, "the child's teachers and providers could certainly have contributed to the development of an IEP that was in line with the student's needs and goals at that point in time." (*Id.* at 35).

Because the IHO found that the IEP was not reasonably calculated to provide L.M. with educational benefits, she elected not to address the other issues raised in the Due Process Complaint about the IEP or the propriety of the Hungerford School. (IHO Op. 35 n.18). The IHO did not list those issues that she considered to be adequately raised in the Due Process Complaint.

(*Id.*).  She made clear, however, that any challenge based on the BIP had not
been preserved for her review.  (*Id.*).

As for the remaining elements of the *Burlington-Carter* test, the IHO went
on to find that the Rebecca School was an appropriate placement for L.M. for
the 2011-12 school year, and that the Parents were entitled to reimbursement
for the tuition paid to the Rebecca School for that year, not to exceed
$86,855.00.  (IHO Op. 38-39).

**G.     The SRO Appeal**

On April 9, 2012, the DOE appealed the IHO's decision by Verified
Petition to the SRO.  (Def. 56.1 ¶ 47).  In particular, the DOE requested that
the SRO reverse the IHO's determinations that Defendant had failed to offer
L.M. a FAPE for the 2011-12 school year, and that the Rebecca School was an
appropriate placement and/or the equities favored the Parents; it also asked
the SRO to annul the IHO's order that the DOE reimburse the Parents for the
Rebecca School tuition.  (DOE Notice with Petition, dated Apr. 9, 2012).
Plaintiffs responded to the Verified Petition on May 4, 2012, by filing a Verified
Answer, in which they asked the SRO to uphold the IHO's decision in its
entirety.  (Def. 56.1 ¶ 48; Parents' Verified Answer, dated May 3, 2012).

On October 24, 2012, the SRO rendered a decision finding that the DOE
had in fact provided L.M. with a FAPE for the 2011-12 school year.  (SRO Op.
19).  The SRO began his opinion by explaining how the 2011-12 IEP was
generated, finding that, although created in January 2011, the IEP had been
developed for the 2011-12 school year.  (*See id.* at 2).  Moreover, at the time the

IEP was prepared, the Parents were advised of their right to reject the DOE's proffered placement.  (*Id.* at 3).  The SRO also listed the reasons initially given by the Parents for rejecting the Hungerford School, and compared them with the allegations in the Due Process Complaint, including the Parents' contention that the "2011-12 IEP was not appropriate because the January 2011 CSE was precluded from considering the student's needs 'as reflected by his/her progress or lack thereof in the second half of the school year' by convening the CSE meeting in January 2011."  (*Id.* at 4-5 (quoting Pl. Exh. A at 2)).

The SRO then outlined the IHO's opinion and, more specifically, the bases for the IHO's determination on each of the issues reached.  (SRO Op. 5-6).  The SRO took specific notice of the fact that Ye had been employed by the DOE in various positions for 19 years, and — with respect to L.M. — had (i) participated in the development of her IEP for three different school years, and (ii) conducted a November 2010 classroom observation of her at the Rebecca School that had been consulted in generating the 2001-12 IEP.  (*Id.* at 6 n.10).

After identifying the relevant legal standards and the parties' positions on appeal (*see* SRO Op. 8-10), the SRO engaged in an assessment of the IHO's decision. [8]  As relevant here, the SRO explained that a FAPE was provided to a

---

[8]    As the SRO identified, the Parents did not file a cross-appeal as to the claims that the IHO did not address (the "Unaddressed Claims") when it answered the Defendant's Petition.  (SRO Op. 7 n.12).  For this reason, the SRO declined to resolve the Unaddressed Claims.  (*Id.*).  The SRO also recognized that the Parents had raised issues and asserted affirmative defenses for the first time on appeal in further support of the IHO's decision.  (*Id.* at 7 n.13).  The SRO declined to address those issues or claims, finding that they were not preserved at the impartial hearing level, and to do so would

student when (i) the DOE complied with the IDEA's procedural requirements and (ii) the IEP was reasonably calculated to enable the student to receive educational benefits.  (*Id.* at 8 (citing *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cnty* v. *Rowley*, 458 U.S. 176, 206-07 (1982))).  On the issue of whether a procedural violation could ever vitiate a FAPE, the SRO observed that "a student [would] not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits."  (*Id.* (citations omitted)).

The SRO then engaged in a disquisition on the issue of whether L.M.'s IEP had been procedurally or substantively defective, as the IHO had found, ultimately concluding that there was "neither an adequate evidentiary or legal basis for the IHO's finding that the timing of the January 2011 CSE meeting either procedurally, or substantively, resulted in an IEP that failed to offer the student a FAPE for the 2011-12 school year." (SRO Op. 10).  To start, the SRO rejected the notion, to the extent implicated by the IHO's decision, that generating the IEP in January 2011 constituted a procedural violation of the IDEA that amounted to a denial of a FAPE.  (*Id.*).  The SRO found that the IDEA did not require an IEP to be produced at a particular time; the timing in this case did not result in a loss of educational opportunity for L.M.; and the record did not demonstrate that the Parents objected to the timing of the CSE

---

"inhibit[] the development of the hearing record for the IHO's consideration, and render[] the IDEA's statutory and regulatory provisions meaningless."  (*Id.*).

meeting, requested another CSE meeting, or otherwise sought to change the 2011-12 IEP after the January 2011 meeting.  (*Id.*).  The SRO also noted that the CSE had discussed with the Parents at the meeting the very fact that the IEP would be implemented in July 2011, and had advised them that the CSE could meet again at any time prior to the beginning of the 2011-12 school year if there were any changes in L.M.'s goals that needed to be reflected in the IEP. (*Id.* at 10-11)  In further support of his conclusion, the SRO cited testimony from L.M.'s special education teacher that "at the January 2011 CSE meeting, [the teacher had] agreed that the annual goals developed for the 'next school year … to the end of June 2012' were appropriate for the student."  (*Id.* at 11 (quoting Hr'g Tr. 73:3-4)).

Next, the SRO assessed the IHO's determination, based on the timing of the January 2011 meeting and a review of the May 2011 Report, that the DOE had failed to offer the student a FAPE because "the IEP did not reflect the student's present levels of academic achievement and functional performance of her academic developmental and functional needs for the 2011-12 school year, and that neither these levels nor the annual goals would be current upon the implementation of the IEP in July 2011."  (SRO Op. 11).  Again, the SRO concluded that the IHO's determination was not supported by the evidence. (*Id.*).

The SRO reviewed the governing Second Circuit decision in *R.E.* v. *New York City Dep't of Educ.*, 694 F.3d at 186 — which made clear that "an IEP must be evaluated prospectively as of the time it was created" — and found

23

improper the IHO's apparent reliance on the May 2011 Report to invalidate the 2011-12 IEP.  (SRO Op. 11-12).  The SRO also supported his conclusion with reference to a district court decision, *J.S. ex rel. Y.S.* v. *North Colonie Cent. Sch. Dist.*, 586 F. Supp. 2d 74, 84 (N.D.N.Y. 2008), which suggested that evidence of a student's progress in a case challenging a proposed IEP is less relevant.  (*See id.* ("The fact that plaintiff is challenging a proposed IEP, as opposed to arguing for the modification of an existing IEP, supports defendant's argument that the Court should refuse to consider evidence of plaintiff's subsequent performance in mainstream courses.")).[9]

After concluding that the IHO's decision was not supported by law or fact, the SRO undertook an independent review of the record, in which he considered L.M.'s present levels of academic achievement and functional performance, as well as her annual goals, to determine whether the 2011-12 IEP complied with the IDEA.  In conducting this assessment, the SRO engaged in a detailed review of the materials on which the CSE team relied, from which he discerned the following information:

- The 2008 neuropsychological evaluation report included a number of assessments from various standardized tests to assess L.M.'s fine motor skills and receptive and expressive language abilities, as well as information provided by the Parents.  The evaluation diagnosed L.M. with PDD-NOS, and recommended that L.M. attend an educational program designed to address PDD symptoms.

---

[9]    The SRO also disagreed with the IHO's criticism of Ye's advice to the Parents that they could reconvene the CSE if they determined the IEP needed to be revised, finding that Ye's statements were not inconsistent with New York State regulations, which provide that where a parent, "teacher or administrator of the school or agency believes that the program or placement recommended in the IEP is no longer appropriate, such party may refer the student to the CSE for review."  (SRO Op. 12 (quoting N.Y. Comp.Codes R. & Regs. tit. 8 § 200.4(e)(4))).

- The November 2010 classroom observation report demonstrated that L.M. interacted with her counselor in an appropriate manner and engaged in a variety of conversational topics.

- The December 2010 Report identified that L.M. was in an 8:1:3 classroom, where she received counseling, occupational therapy, speech-language therapy, and adapted physical education.  The Report also included an education plan developed by the Rebecca School staff and the Parents, which plan included long-term and short-term goals in areas of academics, social skills, and processing skills.  As for related services provided to L.M. at the Rebecca School, the Report provided information about each service and the corresponding long-term and short-term goals, as well as information about L.M.'s progress.

(SRO Op. 12-15).  The SRO compared the evidence contained in these materials with the 2011-12 IEP, and found that that the present levels of performance cited in the IEP "accurately reflected a description of the student's cognitive, academic, and language abilities — as well as social/emotional functioning and sensory regulation — consistent with the information available to the CSE." (*Id.* at 15).

After reviewing the written materials, the SRO explored the oral and/or testimonial evidence on which the CSE relied at the January 2011 meeting. This included discussions among all CSE members about L.M.'s academic achievement and abilities in areas of reading, writing, and mathematics; her strengths and weakness; her related management needs; and her annual and short-term objectives.  (SRO Op. 15).  The SRO also noted that L.M.'s then-current Rebecca School teacher had provided information about her academic achievement on which the CSE had relied to create the present levels of performance in the IEP and to report the academic instructional levels.  (*Id.*).

25

Finally, the SRO conducted a detailed assessment of the 2011-12 IEP's annual goals, and concluded that his review of the record in its totality demonstrated that those goals and short-term objectives were consistent with L.M.'s "identified needs in all areas, including reading, writing, mathematics, language processing, social/emotional functioning, sensory regulation, and motor planning."  (SRO Op. 17).  In relevant part, the SRO stated:

> According to the evidence in the hearing record, the CSE drafted the annual goals and short-term objectives by relying upon the December 2010 Rebecca School progress report and input from the student's then-current Rebecca School teacher and social worker (student's counselor at the Rebecca School).  With respect to drafting the academic annual goals, the special education teacher who participated in the January 2011 CSE meeting testified that she reviewed the December 2010 Rebecca School progress report to identify what the student had been working on related to "specific skills ... in reading, math, [and] writing," which she then discussed with the student's then-current Rebecca school teacher. With respect to drafting the annual goals for the student's related services, the CSE transposed, nearly verbatim, the long-term and short-term goals from the December 2010 Rebecca School progress report directly into the January 2011 IEP. Based upon the parents' concern expressed at the January 2011 CSE meeting regarding the student's ability to count money, the CSE modified the academic annual goals to include an annual goal to address this concern. To create the annual goals related to the student's social/emotional functioning, the special education teacher who participated at the January 2011 CSE testified that the district's school psychologist worked together with the student's counselor at the Rebecca School to develop "all the counseling goals to address" the student's needs.  At the conclusion of the January 2011 CSE meeting, the parents indicated that they did not need to "add" or "change" the information in the "body" of the lEP.

(*Id.* (citations omitted)).

Conversely, the SRO found that the IHO's reliance on the May 2011 Report to conclude that the annual goals in the 2011-12 IEP were not appropriate was misplaced.  (SRO Op. 17).  For one thing, the IHO's decision

did not accurately reflect Tina McCourt's testimony about the goals in the December 2010 Report.  (*Id.* at 17-18).  In particular, McCourt had acknowledged on cross-examination that goals were not always reached within the six-month time frame, and that they could remain, as-is or as-modified, when a new progress report was generated for a particular student.  (*Id.* at 18).  To demonstrate that the December 2010 Report was not null and void after six months, as the IHO had essentially found, the SRO compared the December 2010, May 2011, and December 2011 Reports and found that:

> assuming for the sake of argument that the prospective analysis of an IEP as required under *R.E.* was inapplicable, the hearing record shows that even under a retrospective analysis, the student continued to work on many of the long-term and short-term goals in the December 2010 Rebecca School progress report through at least December 2011, and therefore does not provide a factual basis for the IHO's finding that the annual goals would not be appropriate upon the implementation of the IEP in July 2011.

(*Id.*).  On this basis, the SRO concluded that: "[b]ecause the evidence viewed through the required prospective analysis of the IEP supports the conclusion that the IEP was appropriate, and furthermore, because the evidence does not support the IHO's reasoning that the IEP was flawed when viewed using a retrospective analysis, the IHO's conclusion that the district failed to offer the student a FAPE must be reversed."  (*Id.*).[10]

## H.    The Instant Litigation

On November 21, 2012, having exhausted their administrative remedies as required, Plaintiffs filed the Complaint in this action.  (Dkt. #1).  On April

---

[10]    Because the SRO found that L.M. was provided a FAPE, it declined to reach the issue of whether the Parents' unilateral placement of L.M. at the Rebecca School was an appropriate placement and whether equitable considerations supported the Parents' claim to reimbursement.  (SRO Op. 19).

12, 2013, Plaintiffs filed a motion for summary judgment.  (Dkt. #11).  On May

13, 2013, Defendant filed its Cross-Motion for Summary Judgment and

Opposition to Plaintiffs' Motion for Summary Judgment.  (Dkt. #15).  On June

12, 2013, Plaintiffs filed their opposition to Defendant's Cross-Motion for

Summary Judgment.  (Dkt. #19).  On July 3, 2013, Defendant filed its reply

memorandum in further support of its Cross-Motion for Summary Judgment.

(Dkt. #23).  On August 23, 2013, the Court held oral argument on the parties'

cross-motions for summary judgment.

## DISCUSSION

### A.    The Standard of Review

In IDEA cases, motions for summary judgment "serve as an aid to the

court within a statutory scheme whose purpose is to ensure that children with

disabilities receive the educational benefits to which they are entitled."  *T.Y.*,

584 F.3d at 418.  For this reason, motions for summary judgment in IDEA

cases are "an appeal from an administrative determination" that typically

"triggers more than an inquiry into possible disputed issues of fact."  *Lillbask*,

397 F.3d at 84 n.3 (citations omitted).

The federal court's role in reviewing these state administrative decisions

is, however, "circumscribed."  *R.E.*, 694 F.3d at 189; *see also T.Y.*, 584 F.3d at

417.  A federal court must give "due weight to the state proceedings, mindful

that [the court] lack[s] the specialized knowledge and experience necessary to

resolve questions of educational policy."  *R.E.*, 694 F.3d at 189.  "Keeping in

mind this circumscribed role, the district court engages in an independent

review of the administrative record and makes a determination based on a preponderance of the evidence." *M.B. ex rel. L.C.* v. *Minisink Valley Cent. Sch. Dist.*, 523 F. App'x 76, 77 (2d Cir. 2013) (summary order) (quoting *Gagliardo*, 489 F.3d at 112).  Although the court's review of state administrative decisions "requires a more critical appraisal of the agency determination than clear-error review, [it] nevertheless falls well short of complete *de novo* review." *M.H.* v. *New York City Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012).  The district court may not "substitute their own notions of sound educational policy for those of the school authorities which they review.  *K.Y. ex rel. T.Y.* v. *N.Y. City Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009).

As relevant here, "[c]ourts generally defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *M.H.*, 685 F.3d at 241; *accord A.C. ex rel. M.C.* v. *Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).  Where the IHO and SRO reach competing determinations, courts "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189.

The deference owed to an SRO's decision depends on the quality of that opinion.  *R.E.*, 694 F.3d at 189.  "Deference is particularly appropriate when the state hearing officer's review has been thorough and careful." *Id.* at 184.  In reviewing the administrative decision, a district court is directed to asses "the factors that normally determine whether any particular judgment is

29

persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarly with the evidence and the witnesses than the reviewing court.  *Id.* at 189.

> Judicial review under the IDEA is a "two-part inquiry":
>
> First, the court asks whether the State complied with the procedures set forth in the Act.  Second, the court asks whether the IEP developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits.  If an IEP is deficient — either procedurally or substantively — the court then asks whether the private schooling obtained by the parents for the child is appropriate to the child's needs.

*M.H.*, 685 F.3d at 245 (citation omitted).  In assessing this last question, "equitable considerations relating to the reasonableness of the action taken by the parents are relevant."  *Id.*

## B.   Application

### 1.   The 2011-12 IEP Complied with IDEA's Procedural Requirements

"The initial procedural inquiry in an IDEA case is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."  *T.P. ex rel. S.P.* v. *Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253-54 (2d Cir. 2009).  At the same time, not every procedural error will render an IEP inadequate.  *M.H.*, 685 F.3d at 245.  Instead, "[r]elief is warranted only if the alleged procedural inadequacies impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE to the parents' child, or caused a deprivation of educational benefits."  *Id.*  When determining

whether a district complied with IDEA's procedural requirements, the court must focus on whether the parents "had an adequate opportunity to participate in the development" of their child's IEP.  *Cerra* v. *Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).

Plaintiffs argued in their opening brief that the SRO had incorrectly stated that Plaintiffs were challenging L.M.'s IEP on procedural grounds based on the date when the IEP was generated.  (Pl. Br. 11).  Plaintiffs seemingly reversed course in opposing the DOE's motion for summary judgment, however, arguing that "procedurally, the CSE should not have prepared an IEP five months in advance [of when it would be implemented] because it will inevitably lead to substantive errors."  (Pl. Opp. 3).  At oral argument, Plaintiffs confirmed that they were asserting a procedural violation premised on the time the IEP was created, but recognized that this procedural issue was intertwined with their substantive challenge.  (Oral Argument Tr. 9:9-19).  Plaintiffs' counsel identified the procedural allegation as: "[i]t's procedurally defective because [the meeting] took place in January without accounting [for] …where the child is going to be when the IEP is going to be implemented."  (Oral Argument Tr. 9:11-15).

Although Plaintiffs conflate their procedural and substantive challenges, there is a definite procedural violation alleged, *viz.*, whether the creation of the 2011-12 IEP at the January 2011 CSE meeting amounted to a procedural violation of IDEA.  (*See e.g.*, Pl. Opp. 2 ("First, was it procedurally reasonable for the Committee on Special Education ("CSE") to prepare the IEP over five

months before it was going to be implemented? ... As a procedural issue the question becomes how much time before an IEP is implemented may the CSE prepare the IEP.")).  This issue was ruled on by the IHO and SRO, and accordingly, will be reviewed by this Court.[11]

As noted by the SRO, IDEA does not require that an IEP be generated at any particular time.  Rather, the CSE is required to review a "child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved."  20 U.S.C. § 1414(d)(4)(A)(i).  In addition, there must be an IEP in place "[a]t the beginning of each school year ... for each child with a disability."  Id. § 1414(d)(2)(A).  There is no allegation, and the record does not indicate, that either of these requirements was lacking.

More fundamentally, the record shows that that the Parents had ample opportunity to participate in the development of L.M.'s IEP.  Indeed, the Parents not only attended, but "fully participated," in the January 2011 meeting.  (Hr'g Tr. 24:24-25:9, 406:24-407:4).  J.M. inquired as to "adding or modifying academic goals"; provided the Parents' expectations in regard to L.M.'s transitional goals; helped create those transitional goals; and discussed the Parents' goals for L.M. to "write and read in the proper way."  (Hr'g Tr. 25:3-9, 64:24-65:1, 409:18-25).  Finally, the Parents voiced no objection to the 2011-12 IEP at the meeting, and when asked at the end of the meeting whether

---

[11]     Plaintiffs' related substantive challenge is addressed in the next section.

there was anything they wanted to add or change, the Parents replied "no."'
(Def. Exh. 7).

The SRO correctly concluded that "under the circumstances of this case,"
L.M. was not denied a FAPE for the 2011-12 school year simply because the
annual review was held in January 2011. (SRO Op. 11). The SRO properly
concluded, as a matter of law, that the time at which the IEP was generated did
not amount to a procedural violation, and gave careful consideration as to
whether the IEP drafting process in this case impeded the parents' opportunity
to participate in the decisionmaking process before concluding that it did not.
(*Id.* at 10-11). In particular, the SRO noted the lack of record evidence that the
"parents objected to the timing of the CSE meeting, requested to meet later in
the school year," or were denied a request to convene a subsequent CSE. (*Id.*
at 10). On this record, the Court agrees with the SRO's determination that the
2011-12 IEP fully complied with IDEA's procedural requirements.

Plaintiffs argue that the SRO misstated the decision of the IHO when he
stated that "[t]o the extent that the IHO's decision could reasonably be read as
finding that the timing of the January 2011 CSE meeting, alone, constituted a
procedural violation that rose to the level of a denial of FAPE, such a
conclusion is not supported by the law." (SRO Op. 11). According to Plaintiffs,
they "never argued that the timing of the meeting was a procedural violation
that denied [L.M.] an appropriate IEP." (Pl. Br. 11). This contention, however,
is refuted by the record and by Plaintiffs' arguments to this Court. The IHO's
decision reflects that she did consider the generation of the IEP in January

33

2011 to be a procedural violation.  After identifying the standard for procedural violations (IHO Op. 33), the IHO determined that the IEP was "defective" because the "IEP meeting was held on January 24, 2011 and … the 2011-2012 school year did not begin until July 2011." (*Id.* at 33-34).  Thus, that the IEP was held in January 2011 was critical to the IHO's decision that it was not reasonably calculated to provide L.M. with educational benefits.  What is more, Plaintiffs have also argued to this Court that the timing of the meeting was a procedural violation.  (*See e.g.*, Pl. Opp. 3).  Plaintiffs' attack on the SRO's opinion on this procedural basis is unavailing.

### 2.    The 2011-12 IEP Complied with IDEA's Substantive Requirements

In considering substantive challenges, a court must recognize that an IEP need not provide "every special service necessary to maximize each handicapped child's potential."  *Grim* v. *Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003).  A school district's program must provide "special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits."  *Walczak*, 142 F.3d at 122 (citation omitted).  An IEP is adequate if it is "likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement."  *T.P.*, 554 F.3d at 254.

"[I]n order for the district court to conduct an independent review of the sufficiency of an IEP under the IDEA that does not impermissibly meddle in state educational methodology, it must examine the record for objective

evidence that indicates whether the child is likely to make progress or regress under the proposed plan." *Gagliardo*, 489 F.3d at 113. "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382. Indeed, a SRO's decision regarding "the substantive adequacy of an IEP" should be afforded heightened judicial deference, particularly when the court's review "is based entirely on the same evidence as that before the SRO." *M.H.*, 685 F.3d at 244.

The Court's independent review of the record confirms the SRO's decision that the 2011-12 IEP was reasonably calculated to enable L.M. to receive educational benefits. The CSE considered ample evidence — medical reports, observational data, and input from those with the most knowledge of L.M.'s academic and social capabilities and needs — to create an IEP that would be appropriate when implemented in July 2011. (*See* Def. 56.1 ¶ 7). Moreover, as Tina McCourt of the Rebecca School acknowledged, the Hungerford School was capable of implementing the 2011-12 IEP in July, had the Parents accepted that placement. (Hr'g Tr. 108:7-112:18).

The SRO's decision reflects a thorough review of the record and of the parties' arguments in assessing whether the 2011-12 IEP was reasonably calculated to enable L.M. to receive educational benefits. Consequent to this review, the SRO reached a well-reasoned conclusion that the 2011-12 IEP was substantively sound, which conclusion is entitled to the utmost deference.

*Walczak*, 142 F.3d at 129 ("Deference is particularly appropriate when, as here, the state hearing officers' review has been thorough and careful.").

By comparison, a review of the IHO Opinion demonstrates that it does not warrant deference from the Court, especially when compared to the analytically intensive opinion rendered by the SRO.  Put simply, the IHO Opinion is long in its recitation of the testimonial evidence, and short (in the Court's estimation, unduly short) in its analysis of the issues presented.[12]  The IHO also issued contradictory findings regarding the evidence considered by the CSE when it created the 2011-12 IEP, which evidence is at the core of the disputed issue in this case.  (*Compare* IHO Op. 7, *with* IHO Op. 9).

The Parents anticipated that they would receive reimbursement from the DOE for the Rebecca School tuition, as they had in preceding years, but such anticipation does not amount to an entitlement and, more to the point, does not provide a basis to challenge the 2011-12 IEP.  The IDEA does not entitle a student to the "best education that money can buy."  *Walczak*, 142 F.3d at 130 (quoting *Lunceford* v. *D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984) (Ginsburg, J.)); *see also Antonaccio* v. *Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 726 (S.D.N.Y. 2003) ("[T]he IDEA does not require a school district to 'maximize the potential of a handicapped child.'  And it does not require a school district to provide 'everything that might be thought desirable by loving parents'" (quoting *Rowley*, 458 U.S. at 197 n.21, and *Tucker*

---

[12]    Indeed, 31 pages of the 39-page opinion are devoted to summarizing the testimony, with a notable focus on testimony unrelated, or only collaterally related, to the issue of whether the 2011-12 IEP was reasonably calculated to provide L.M. with educational benefits.

v. *Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir. 1989))).

Similarly, while the Parents might have preferred the Rebecca School, such

preference does not compel a finding by this Court that the 2011-12 IEP was

defective for the issues addressed at the administrative level.  To the contrary,

because the 2011-12 IEP would have provided L.M. with "an opportunity for

meaningful progress," the Court must uphold the SRO's decision.

> **a.  The SRO Properly Found That the CSE Based the IEP on Sufficient Evaluative Data**

The SRO rejected the IHO's finding that Defendant failed to offer L.M. a

FAPE "because the IEP did not reflect the student's present levels of academic

achievement and functional performance or her academic development and

functional needs for the 2011-12 school year, and that neither these levels nor

the annual goals would be current upon the implementation of the IEP in July

2011."  (SRO Op. 11).  Plaintiffs argue that the SRO's decision is contrary to

law because the "SRO bizarrely decided that as a matter of law the examination

of an IEP does not include any examination as to whether the child would

make progress subsequent to the meeting."  (Pl. Br. 17).  This is not what the

SRO held.  Instead, and as discussed below, the SRO determined that, in

accordance with Second Circuit precedent announced in *R.E.* v. *New York City

Dep't of Educ.*, "an IEP must be evaluated prospectively as of the time it was

created."  (SRO Op. 11 (quoting *R.E.*, 694 F.3d at 188)).

Plaintiffs also contend that the prospective analysis established in *R.E.*

frames the issue as whether the IEP is "appropriate *as written*," not whether it

is "appropriate *when written*" (Pl. Br. 17 (emphases in original)), and argue

from this distinction that the SRO erred in finding "that the IEP was appropriate [as written]" (Pl. Opp. 1).  Again, this is not what the SRO held. Plaintiffs misconstrue both the SRO's assessment of *R.E.* and its application to this case.

In *R.E.*, the Second Circuit adopted "the majority view that the IEP must be evaluated prospectively as of the time of its drafting and therefore [held] that retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered in a *Burlington-Carter* proceeding." *R.E.*, 694 F.3d at 186.  In so doing, the Court identified the expansiveness of its holding:

> Parents who end up placing their children in public school cannot later use evidence that their child did not make progress under the IEP in order to show that it was deficient from the outset.  In determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision.

*Id.* at 187 (citation omitted).

The holding of *R.E.* is immediately applicable here.  Plaintiffs seek to use the May 2011 Report — information that purportedly demonstrates L.M.'s progress, and that was concededly unavailable to the CSE at the time of the January 2011 meeting — to establish the deficiency *ab initio* of the 2011-12 IEP.  Allowing Plaintiffs to undo the 2011-12 IEP on this basis would conflict with *R.E.*'s basic proscription against using retrospective evidence to undo what was an appropriate IEP at the time it was written.  Thus, the SRO's holding that the subsequent Rebecca School progress reports may not be

utilized to obviate the appropriateness of the IEP was a well-reasoned application of *R.E.* to which the Court should defer.[13]

### b.    The SRO's Review of L.M.'s Annual Goals

An IEP must include a written "statement of measurable annual goals, including academic and functional goals designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum, and meet each of the child's other educational needs that result from the child's disability."  20 U.S.C. § 1414(d)(1)(A)(i)(II).  The SRO conducted a comprehensive review of L.M.'s annual goals, including the materials used to identify the goals, to ensure that the 2011-12 IEP was substantively appropriate.  (SRO Op. 16-18).

In a corollary to their procedural challenge to the IEP, Plaintiffs take issue with the SRO's assessment of the data used by the CSE to generate the annual goals.  Specifically, Plaintiffs argue that the IEP was substantively inappropriate because "the goals that were developed were designed to be out of date before the IEP was implemented," since they were based on the

---

[13]    Even before *R.E.*'s pronouncement of this tenet, district courts in this Circuit refrained from engaging in "Monday-morning quarterbacking" to undo an IEP that was reasonably calculated to enable a child to receive educational benefits.  *See, e.g.*, *J.R.* v. *Bd. of Educ. of City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 395 (S.D.N.Y. 2004) ("This determination is necessarily prospective in nature; we therefore must not engage in Monday-morning quarterbacking . . . ."); *J.S.*, 586 F. Supp. 2d at 84 ("[A] number of district courts within the Second Circuit have refused to engage in a retrospective approach when considering the appropriateness of a disabled student's IEP."); *Antonaccio*, 281 F. Supp. 2d at 724 (holding that *ex post* evidence of a student's progress or lack thereof does not render an IEP appropriate or inappropriate; whether the IEP at issue was reasonably calculated to confer educational benefits on the student must be evaluated at the time the CSE devised the IEP).  Evidence of a student's subsequent development is even less relevant to the Court's analysis here where Plaintiffs challenge a proposed IEP, as opposed to arguing for the modification of an existing IEP.  *See J.S.*, 586 F. Supp. 2d at 84.

December 2010 Report (*see* Pl. Br. 11), and that the CSE made no effort to draft an IEP that would be appropriate when implemented (Oral Argument Tr. 53:18-54:25). Plaintiffs further argue that the SRO erred by concluding the IEP was appropriate where he found that ten goals had been met before the 2011-12 IEP was implemented, and by ignoring three additional goals that were added. (Pl. Br. 12). Plaintiffs' contentions are refuted by the record. The evidence demonstrates, and the SRO's opinion reflects, that the CSE focused on creating an IEP that would be appropriate when implemented, and that the 2011-12 IEP's goals were substantively appropriate. As the SRO identified, the 2011-12 IEP's goals were the product of a review of the December 2010 Report and other materials, which review was amplified by collaborative discussions among the CSE members, as to what the materials indicated and what the members anticipated would be appropriate goals for L.M. throughout the upcoming school year. (SRO Op. 17).

Plaintiffs further argue that the SRO erred in (i) crediting testimony from DOE representative Ye regarding L.M.'s goals that the IHO refused to credit, and (ii) failing to address the change in L.M.'s levels of performance between December 2010 and May 2011. (Pl. Br. 14). As a preliminary matter, the record does not reflect any basis on which crediting Ms. Ye's testimony would be improper. In any event, the SRO did not base his determination on Ye's testimony alone. Rather, the SRO noted that the IHO's decision neglected to "reflect the entirety of the director's testimony about the goals in the Rebecca School progress reports." (SRO Op. 17). The SRO then provided abundant

record evidence demonstrating that, while the parties preparing the December 2010 Report may have intended to set six-month goals, not all goals were achieved during the time period —  and, thus, that incorporating goals from the December 2010 Report in the 2011-12 IEP did not render the latter document obsolete.

Furthermore, the SRO did review the change in L.M.'s levels of performance.  The SRO compared the Rebecca School progress reports for December 2010, May 2011, and December 2011, which reports confirmed that goals included in the December 2010 Report were appropriate when the 2011-12 IEP would have been implemented.  (SRO Op. 18 ("[T]he hearing record shows that even under a retrospective analysis, the student continued to work on many of the long-term and short-term goals in the December 2010 Rebecca School progress report through at least December 2011, and, therefore does not provide a factual basis for the IHO's finding that the annual goals would not be appropriate upon the implementation of the IEP in July 2011.")).  In stark contrast, the IHO conducted *no* comparison of the particular goals and services indicated in the 2011-12 IEP with those in the December 2010, May 2011, or December 2011 Reports.  Nor did the IHO consider evidence concerning the development of the goals from those reports or from the testimony from witnesses (including witnesses the IHO had explicitly credited), which evidence made plain that the 2011-12 IEP was generated not solely by reference to the December 2010 Report, but rather after collaboration among

41

CSE members who had particular familiarly with L.M.'s academic levels, and with reference to sources of L.M.'s academic and medical assessments.

### c.   The SRO Did Not Err in His Review of L.M.'s Academic Achievement and Functional Performance

The SRO conducted a meticulous review of the materials that the CSE considered in generating the January 2011 IEP, an exercise that the IHO notably failed to do.  As detailed above, when developing an IEP, the CSE is required to review the "existing evaluation data," which can include "evaluations and information provided by the parents of the child, current classroom-based, local, or State assessments, and classroom-based observations, and observations by teachers and related service providers."  20 U.S.C. § 1414(c)(1)(A).

Here, the CSE relied on several forms of assessment, including a 2008 neuropsychological evaluation report, a November 2010 classroom observation report, a December 2010 Rebecca School progress report, and oral input from the CSE members with knowledge of different aspects of L.M.'s academic and social development.  After engaging in a detailed review of each assessment, the SRO concluded that a comparison of the 2011-12 IEP with the information considered by the CSE members in January 2011 "indicates that the present level of performance in the [2011-12] IEP accurately reflected a description of the student's cognitive, academic, and language abilities — as well as social/emotional functioning and sensory regulation — consistent with the information available to the CSE."  (SRO Op. 15).  The record demonstrates

that the SRO gave careful attention to the assessments in order to reach his

determination, and it is one that is entitled to deference by the Court.

### 3.   The Court Need Not Address the Parents' Unilateral Placement and Equitable Considerations

Plaintiffs maintain that the Rebecca School was an appropriate

placement for L.M., and that the "equities favor reimbursement" for the tuition

the Parents paid for L.M. to attend the Rebecca School for the 2011-12 school

year.  (Pl. Br. 24, 28).  The Court need not reach these issues.

In accordance with the deference owed to state administrative decisions,

*M.H.*, 685 F.3d at 241, where, as here, the SRO's decision "has been thorough

and careful[]," *R.E.*, 694 F.3d at 189, the Court finds that the SRO correctly

determined that the DOE offered L.M. a FAPE in the least restrictive

environment for the 2011-12 school year, and consequently, that the Parents

are not entitled to reimbursement for the tuition paid to the Rebecca School.

Thus, the Court "need not reach the issues whether the additional services

provided by the parents were appropriate, or whether equitable considerations

affect relief."  *T.P.*, 554 F.3d at 254 (citation omitted); *A.C. ex rel. M.C.*, 553 F.3d

at 173 ("Because we find that the M.C.'s 2004-2005 IEP was neither

procedurally flawed nor substantively deficient, we need not reach the issues

whether the private placement at Eagle Hill was appropriate, or whether

equitable considerations affect relief." (citation omitted)).

### 4.   The SRO Erred In Not Resolving the Unaddressed Claims

The SRO declined to address the Unaddressed Claims raised in the Due

Process Complaint because Plaintiffs did not cross-appeal from the IHO's

decision.  (SRO Op. 7 n.12).  Plaintiffs ask this Court to resolve the Unaddressed Claims in their favor or, alternatively, remand the issues to the IHO.  (Pl. Br. 18; Pl. Opp. 8).  Defendant argues that these claims should either be remanded to the SRO or, if reviewed by the Court, denied as lacking merit. (Def. Br. 17-18).

The SRO supported its decision with reference to regulatory law that provides: "A party who fails to obtain a favorable ruling with respect to an issue submitted to an IHO is bound by the ruling unless the party either asserts an appeal or interposes a cross-appeal."  (SRO Op. 7 n.12 (citing 34 CFR § 300.514(a))).  As other courts in this District have recognized, however, a plaintiff's failure to cross-appeal claims not addressed by the IHO where the plaintiff is not "aggrieved" neither results in a waiver of those claims nor gives an SRO carte blanche to ignore those claims on appeal.[14]  *FB* v. *New York City Dep't of Educ.*, 923 F. Supp. 2d 570, 589 (S.D.N.Y. 2013) (holding that the "Parents were not required to cross-appeal issues raised in their due process complaint but not addressed by the IHO in his decision ruling in their favor," and that the SRO, therefore "erred in excluding those issues from consideration when he determined whether [the student] had been denied a FAPE"); *J.F.* v. *New York City Dep't of Educ.*, No. 12 Civ. 2183 (KBF), 2012 WL 5984915, at *9 (S.D.N.Y. Nov. 27, 2012) ("The Court therefore finds that a party's failure to cross-appeal an issue never reached by the IHO does not necessarily constitute a waiver of its right to pursue that issue."); *D.N.* v. *New York City Dep't of Educ.*,

---

[14]    Defendant expressly recognizes the Court's authority to remand those claims not addressed by the SRO.  (Def. Br. 16).

905 F. Supp. 2d 582, 588 (S.D.N.Y. 2012) (holding that claims not addressed by the IHO that the parents did not cross-appeal were properly before the Court); *see also R.B. ex rel. L.B.* v. *Bd. of Educ. of N.Y.*, 99 F. Supp. 2d 411, 415 (S.D.N.Y. 2000) (holding that the plaintiff was not required to appeal a hearing officer's decision where plaintiff prevailed at the impartial hearing); *see generally* N.Y. Educ. Law § 4404(2) (McKinney 2013) (a SRO "shall review and may modify, in such cases and to the extent that the review officer deems necessary, in order to properly effectuate the purposes of this article, any determination of the impartial hearing officer relating to the determination of the nature of a child's handicapping condition, selection of an appropriate special education program or service and the failure to provide such program").

Here, Plaintiffs were not aggrieved by the failure to resolve the Unaddressed Claims, and thus were not required to cross-appeal.  The "IHO made no adverse particular findings" on Plaintiffs' additional claims that L.M. was denied a FAPE, and the IHO did not need to resolve those claims in order to grant Plaintiffs the relief requested.  *J.F.*, 2012 WL 5984915, at *10.  In line with other courts in this District, the Court finds that the SRO should have considered Plaintiffs' Unaddressed Claims to determine whether those claims established that L.M. had been denied a FAPE.

### 5.   Plaintiffs' Remaining Challenges to the IEP Are Remanded to the IHO

The Unaddressed Claims include claims that: (i) the CSE lacked a proper basis to recommend a public school placement; (ii) the level of occupational therapy was not appropriate; (iii) the Hungerford School was not appropriate;

(iv) the IEP and the Hungerford School failed to address L.M's need to leave and work outside the classroom when disregulated; (v) the Hungerford School lacked a quiet/crisis room; (vi) a crisis management paraprofessional was not appropriate; (vii) the IEP transition plan was fatally vague; and (viii) the TEACCH Model was not appropriate.[15]  These claims involve important questions of state educational policy and require educational expertise to resolve.  As such, the Court is ill-equipped to address these claims in the first instance.  *See R.E.*, 694 F.3d at 189 ("[The court] lack[s] the specialized knowledge and experience necessary to resolve questions of educational policy."); *T.Y.*, 584 F.3d at 418 ("[A]dministrative agencies have special expertise in making judgment concerning student progress." (quoting *Cerra*, 427 F.3d at 195)).  Because neither the IHO nor the SRO reached these issues, this Court remands the question of whether L.M. was denied a FAPE based on Plaintiffs' Unaddressed Claims to the IHO as the finder of fact presiding over the first level of review in challenges under the IDEA.  *J.F.*, 2012 WL 5984915, at *10 (remanding the question of whether the student's classroom placement was appropriate to the IHO because "neither the IHO nor the SRO has reached that issue").

---

[15]   The Parties dispute whether all Unaddressed Claims that Plaintiffs raise here were raised in Plaintiffs' Due Process Complaint.  Plaintiffs argue that "several allegations" in their Due Process Complaint, as well as issues raised during the Impartial Hearing, put Defendant on notice of the specific claims Plaintiffs identify before the Court.  (Pl. Opp. 8-9).  Defendants argue the contrary position.  (Def. Br. 15).  The Court declines to resolve this issue because the IHO is better situated to ascertain what claims Plaintiffs raised in their Due Process Complaint.

## CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of Defendant as to those claims addressed by the IHO and SRO.  The Court denies summary judgment as to both parties on the broader issue of whether the overall IEP denied L.M. a FAPE, and remands this matter to the IHO to complete her review of Plaintiffs' claims, consistent with the foregoing discussion.

The Clerk of Court is directed to terminate Docket Entries 11 and 15, and to mark the case as closed.

SO ORDERED.

Dated: November 7, 2013
        New York, New York

_____
       KATHERINE POLK FAILLA
       United States District Judge